UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HAWA IDRISSU,

    Plaintiff,                                  Civil Action No. 17-CV-13794

vs.                                          HON. BERNARD A. FRIEDMAN

AEROTEK, INC.,

    Defendant.

_____/

## **OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is presently before the Court on the motion of defendant Aerotek, Inc. ("Aerotek") for summary judgment [docket entry 11]. Plaintiff has filed a response in opposition, and defendant has filed a reply. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide the motion without a hearing.

*Background*

This is a pregnancy discrimination case. Defendant is a staffing company that provides temporary contract employees to its clients, one of which was, at all times relevant to this matter, General Motors ("GM"). In 2015, plaintiff was hired by defendant and assigned to work at GM's call center in Warren, Michigan. At the call center, plaintiff alleges that defendant demoted her, failed to promote her, and subjected her to a hostile work environment because she was pregnant. These events allegedly occurred while plaintiff held various positions within the call center, as noted in the following summary.

In November 2015, plaintiff began working for defendant as a "tier two" customer service representative at the call center. Pl.'s Dep. at 14, 21. Julia Monette, a GM trainer, informed

plaintiff and the other new Aerotek employees that defendant would maintain an office at the call center and that defendant would be responsible for managing all human resources functions, such as payroll and requests for time off. *Id.* at 15-17. GM's role was to supervise employees, monitor the "job matrix" (a record used to assess employee performance), and provide employees and Aerotek with feedback about employee performance. *Id.* at 17-21, 35. While working at tier two, plaintiff's GM trainer/supervisor was Tawanna King. *Id.* at 24-30. During her training, plaintiff was told that GM team leaders would, among other things, advise defendant when particular employees were ready for promotion. *Id.* at 35-37.

After some time working at tier two, plaintiff began receiving positive feedback about her performance. *Id.* at 39-40. Nicole Abdilla, defendant's on-site manager, told plaintiff that she "was performing exceptionally well and she saw promotions in my future." *Id.* at 40. Two other Aerotek supervisors, Aja Hawkins and LaTondra Cannon, told plaintiff that King "stated that I was ready to be promoted." *Id.* at 41.

Based on King's recommendation, plaintiff was promoted to the "red hat" team, which supported the tier two workers. *Id.* at 44. While in this position, plaintiff was supervised by Sherena Kelly and Julia Monette, both of GM. *Id.* at 17, 55, 61. On June 17, 2016, plaintiff's physician informed her that she was experiencing a high-risk pregnancy, which would require her to report twice per week for treatment and tests. *Id.* at 50, Pl.'s Ex. E. Plaintiff presented a doctor's note to King and Shaunta Tyus, defendant's on-site administrator. Pl.'s Dep. at 50-52. King and Tyus advised plaintiff to inform human resources regarding the days she needed to take off. *Id.* Plaintiff did so, requesting to leave work early every other Friday and to take one day off every six weeks for doctor appointments. *Id.* at 56.

On June 22, plaintiff was told by Aja Hawkins, defendant's on-side recruiter, that plaintiff would no longer be on the red hat team because she was not "a good fit" for the position and because the team already had enough people. *Id.* at 50-53. The next day, plaintiff asked LaTondra Cannon, defendant's on-site recruiter, for a meeting with "the person(s) that made the decision to remove her from red hat." Pl.'s Ex. H. Cannon communicated this request to Abdilla, Tyus, and Hawkins. *Id.* In response, Hawkins indicated that "Shereena, Julia, and myself" should be present at the requested meeting. *Id.*

At this meeting, which was held on June 24, plaintiff asked "why I was removed off of Red Hat when you guys already knew that I had to take this time off." Pl.'s Dep. at 55. According to Monette's minutes of the meeting, Kelly indicated that "due to your availability we will be having you return to the floor. . . . Because of your availability we can't use you as a Red Hat." Pl.'s Ex. I. Kelly also said that plaintiff had been "aggressive." *Id.* However, the day after this meeting, King told plaintiff that she would not be removed from the red hat team after all. Pl.'s Dep. at 59. Kelly told plaintiff that "they"[1] had changed their minds, and plaintiff was returned to the red hat team. *Id.* at 60. Plaintiff was permitted to take the time off that she had requested. *Id.* at 91.

On July 8, 2016, Abdilla (of Aerotek) sent Kelly and Monette the following email:

> The following people are Red Hat and per our goal in setting Red Hat up, *we want to consider them for promotions*. Is there any feedback you have on these . . . advisors for a possible move to the Case Resolution Team?
>
> Jeanice Globe

---

[1] Plaintiff does not know who "they" were, Pl.'s Dep. at 60, but in an email dated June 24, Tyus told other Aerotek staff that "[t]he trainers and Aja [of Aerotek] have decided to keep [plaintiff] as a red had [sic] and will have back up support for the days of her doctor's appointments." Pl.'s Ex. J.

> Vern White
> Bernard Draper
> John Hill
> Hawa Idrissu
> Ashley Pitts.
>
> Let us know your thoughts. The move will be quick.

Pl.'s Ex. L (emphasis added). The same day, Abdilla sent an email to Andrea Fignar (of GM) regarding "Red Hat Feedback," stating: "*We are promoting* 3." *Id.* (emphasis added). On July 12, in response to the request for feedback, Monette commented that Globe was dependable, that White "can sometimes come off as intimidating," that Draper "has great presentation skills and works well with the team," that Hill could work on being more confident and speaking up more to share his knowledge and thoughts," that plaintiff "can sometimes come across a little short or confrontational . . . [and] wants to help others succeed and is capable of receiving feedback," and that Pitts "can seem a little bored with her role . . . [but] this is due to her being ready to take on more responsibility." Pl.'s Dep. at 117-18, Pl.'s Ex. M. Later that day, Fignar emailed Abdilla: "Here are our selections: Bernard Draper, Jeanice Globe, Ashley Pitts." Pl.'s Ex. N. On July 13, Abdilla emailed two GM people, with a copy to Fignar, stating: "Bernard declined because he will be leaving. In his place, *we have promoted* Vern." *Id.* (emphasis added).

In August, King recommended plaintiff for a promotion to the executive tier team. Pl.'s Dep. at 71. Plaintiff took a written test for this position. Hawkins (of Aerotek) told plaintiff "that I had the position and that I passed the test." *Id.* at 72. King also told plaintiff that she had passed. *Id.* Plaintiff then had an interview at which both Aerotek and GM representatives were present. *Id.* at 73. LaTondra Cannon, defendant's on-site recruiter, informed plaintiff that she had received the promotion and that she was transitioning from the red hat team to the executive tier

4

team. *Id.* at 74. Plaintiff's promotion was celebrated by King, who organized a congratulations party on the Friday of that week. *Id.* King attended the party and announced plaintiff's promotion. *Id.* at 74-75.

The following Monday, plaintiff reported to the executive tier team section to begin her training. *Id.* at 76. To plaintiff's surprise, however, she was approached by an unnamed GM employee who informed her that she was not on the list to be trained and that she was expected "to go back to caseload." *Id.* at 76. This list, which appears in an email from defendant's on-site manager, Therese Demres, to two GM representatives, stated that Kenneth Hobbs, Katrina Tucker and Taynia Bethea "have accepted the offers given to them for the Executive Department" and "are excited for the opportunity and will be ready for training on Monday, August 15th at 8:00am." Pl.'s Ex. T. Confused by this turn of events, plaintiff asked King why she was not on the list. Pl.'s Dep. at 77-78. King did not know but said she would find out. *Id.* at 78. Later that week, however, Aerotek left the call center, apparently having been replaced by another staffing company. *Id.* Plaintiff remained at the call center for another month but was not placed on the executive tier team. *Id.*

Based on these events, plaintiff claims in Count I of her complaint that defendant discriminated against her based on her pregnancy, in violation of the Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2202. In Count II, she claims that defendant subjected her to a hostile work environment, based on various comments and other treatment discussed below.

***Summary Judgment Standard***

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows

5

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Viewing the evidence in the light most favorable to the opposing party, summary judgment may be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party. *See id.* at 248-50; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-80 (6th Cir. 1989). In other words, "[a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp.*, 899 F.2d 533, 534 (6th Cir. 1990). "The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).

*Discussion*

    **A.** *Pregnancy Discrimination*

    As this Court recently noted,

> Elliott Larsen prohibits an employer from "discriminating against individuals on the basis of sex with respect to a condition of employment [,]" and "discrimination because of a woman's pregnancy is a form of discrimination because of sex." *Haynie v. State*, 468 Mich. 302, 664 N.W.2d 129, 133–34 (2003). . . . Elliott Larsen claims are analyzed "under the same framework as Title VII claims[,]" . . .. *See Latowski v. Northwoods Nursing Ctr.*, 549 Fed.Appx. 478, 483 n. 2 (6th Cir.2013) (citing *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 n.4 (6th Cir.2003)).

    \*   \*   \*

> Under the indirect evidence framework, [plaintiff] has the burden "of proving a prima facie case of discrimination; if she is

6

> successful, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions; finally, the plaintiff has the opportunity to prove that the proffered reason is pretextual." *Latowski*, 549 Fed.Appx. at 483. [Plaintiff's] prima facie burden includes the following four elements: "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Id.*; *see also DeBoer v. Musashi Auto Parts, Inc.*, 124 Fed.Appx. 387, 390 (6th Cir.2005). The prima facie case "is not meant to be an onerous burden, and the amount of evidence a plaintiff must produce on the elements is not great." *Id.* at 390.

*Huffman v. Speedway LLC*, 21 F. Supp. 3d 872, 875 (E.D. Mich. 2014).

Defendant's first argument rests on case law addressing the liability of staffing companies in the employment discrimination context. The cited cases stand for the proposition that an adverse employment action taken by a staffing company's client generally will not subject the staffing company to liability. In those cases, there was no evidence suggesting that the staffing company participated in the adverse action other than to inform the employee of the decision made by its client. Defendant argues that the same reasoning should apply here because it "did nothing more than supply workers to GM" and merely communicated the employment decisions "made by GM employees to Aerotek contract employees." Def.'s Summ. J. Br. at 12.

In the present case, several factors might persuade a reasonable jury that defendant did not merely supply workers, including plaintiff, to GM, but that it actively participated in the decisions not promote plaintiff. First, defendant, which maintained an office staffed with managers at the call center, was present and actively participated in the interview process when plaintiff was considered for promotion to the executive tier team. Pl.'s Dep. at 73. Plaintiff's coworkers likewise testified that defendant was present when interviews were held with candidates being considered for promotions to the case resolution team and the executive tier team. Pitts Dep. at 13, Hobbs Aff. ¶¶

7

7-8.

Second, when plaintiff requested a meeting with the "person(s) that made the decision to remove her from red hat," Pl.'s Ex. H, Hawkins, defendant's on-site recruiter, asserted that she should be present at the meeting along with the GM employees who trained plaintiff. *Id.* During this meeting, Hawkins and Kelly both provided plaintiff with reasons why she had been demoted. Pl.'s Ex. I.

Third, defendant's correspondence with GM suggests that defendant may have participated in decisions regarding promotions. As noted above, Abdilla (of Aerotek) wrote to GM representatives that "we want to consider" promoting certain red hat members to the case resolution team, that "we are promoting" three red hat members to that team and, later, that "we have promoted Vern."

Fourth, although plaintiff was assured by both Hawkins (of Aerotek) and King (of GM) that she had received the promotion from the red hat team to the executive tier team, she was turned away when she reported for training because she was not on the list of those who had been promoted, and this list was prepared by Demres (of Aerotek).

Viewing this evidence in the light most favorable to plaintiff, a reasonable jury could find that defendant did not merely supply workers to GM, but that it actively participated in deciding which employees, including plaintiff, would be promoted and, indeed, that defendant may have thwarted GM's recommendations that plaintiff be promoted.

Defendant next argues that even if it was involved in the decisions to demote, or not to promote, plaintiff, summary judgment should be granted in its favor because (1) plaintiff did not suffer an adverse employment action when she was temporarily removed from the red hat team, and

8

(2) there were legitimate, non-discriminatory reasons not to promote her to the case resolution team and the executive tier team. While the Court finds merit in defendant's first argument, a jury must decide whether the reasons not to promote plaintiff to the other positions were pretexts for unlawful discrimination.

Plaintiff's claim concerning her removal from the red hat team fails because that demotion was temporary and quickly remedied. "[W]hen an employer imposes an employment action that would be an adverse employment action but then quickly reverses the action, the employee has not suffered an adverse employment action." *Keeton v. Flying J, Inc.*, 429 F.3d 259, 263 (6th Cir. 2005). Plaintiff concedes that she was reinstated to the red hat team just days after being told she would be removed, and she does not claim that she suffered any loss of pay. Pl.'s Dep. at 59. Under *Keeton*, this temporary demotion is not actionable. Therefore, the Court shall grant summary judgment to defendant on this portion of plaintiff's discrimination claim.

Defendant argues it is entitled to summary judgment on plaintiff's failure-to-promote claims because GM legitimately decided not to promote plaintiff to the case resolution team because of her communication skills, and that it legitimately decided not to promote her to the executive tier team because she swore during her interview. To meet her burden to show that this explanation is pretextual, plaintiff may offer evidence demonstrating it "(1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008).

In this case, plaintiff has cast enough doubt on the validity of defendant's explanations to require submission of the issue to a jury. A reasonable jury could doubt that plaintiff's allegedly poor communication skills were the reason she was not promoted to the case

9

resolution team, given that in the months before she gave notice of her pregnancy plaintiff's supervisor, King, recommended her for both promotions and, according to plaintiff's testimony, she was "constantly being taken off the floor to assist with training and being used for examples to assist with new hires." Pl.'s Dep. at 124. The only evidence of plaintiff's possibly questionable communication skills is Monette's July 12 comment that plaintiff "can sometimes come across a little short or confrontational." Pl.'s Dep. at 118. Yet a jury might doubt the importance to defendant of "communication skills" given that defendant selected Vern White, whom Monette criticized as "sometimes com[ing] off as intimidating," to replace Draper.

A jury might also reject defendant's explanation for not promoting plaintiff to the executive tier team. Whether plaintiff swore or not, plaintiff has testified that both defendant and GM told her that she had passed the test and received this promotion. King (of GM) even threw a party for plaintiff to celebrate the event on the Friday of the week when plaintiff was promoted, but on the following Monday plaintiff's name was not on the list of those who had been promoted – a list prepared by Demres (of Aerotek). It will be for the jury to decide why plaintiff was not on this list.

**B.** *Hostile Work Environment*

Plaintiff also claims that defendant subjected her to a hostile work environment.

> A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks and citation omitted). Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim. *Id.* at 21–22, 114 S.Ct. 367.

*Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). In determining whether the harassment was sufficiently severe,

> we consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367; see also *Williams v. GMC*, 187 F.3d 553, 560-62 (6th Cir.1999). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment...." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). "[S]imple teasing, ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal citation and quotation marks omitted). We do not limit our analysis to the narrow set of incidents directed at the plaintiff or occurring in the plaintiff's presence, *Jackson v. Quanex*, 191 F.3d at 660, but comments or conduct of which a plaintiff had no knowledge cannot be said to have made her work environment hostile, see *Hawkins*, 517 F.3d at 335-37 (similar acts of harassment occurring outside of plaintiff's presence may be evidence of hostile work environment if plaintiff was aware of them during her employment) (citing cases); *Abeita v. TransAmerica Mailings*, 159 F.3d 246, 249 n. 4 (6th Cir.1998) (instances of harassment of other employees irrelevant if "there is no evidence that plaintiff was aware" of them).

*Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009).

In an effort to show that she was subjected to a hostile work environment, plaintiff points to an email from defendant GM referring to plaintiff as the employee with the "pregnant situation." However, there is no evidence plaintiff became aware of this email until after her employment at the call center had ended. She also points to a statement of one of the GM trainers who told her not to discuss her pregnancy with her coworkers, but this statement cannot be imputed to defendant.

Plaintiff also points to statements made by Hawkins (of Aerotek) to the effect that she, Hawkins, did not have to honor plaintiff's doctor's note, that plaintiff could not wear open-toed

shoes, and that plaintiff was not a "good fit" for the red hat team; and to a statement by an unnamed Aerotek supervisor who told plaintiff she should not use the bathroom so frequently. Plaintiff also points to her temporary demotion from the red hat team and her two missed promotions. These comments and events simply are not severe or persistent enough to constitute a hostile work environment. The Sixth Circuit "has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory," *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017), and the facts alleged in the present case do not come close to meeting that bar. The Court shall therefore grant summary judgment for defendant on this claim.

For the reasons stated above,

IT IS ORDERED that defendant's motion for summary judgment is granted in part and denied in part as follows: On Count I, the motion is granted as to plaintiff's "red hat demotion" but otherwise denied. On Count II, the motion is granted. The case shall proceed on plaintiff's claims that defendant failed to promote her to the case resolution team and to the executive tier team.

Dated: August 9, 2018      s/Bernard A. Friedman
Detroit, Michigan     BERNARD A. FRIEDMAN
    SENIOR UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 9, 2018.

    s/Johnetta M. Curry-Williams
    Case Manager